**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CARLTON SULLINS, RITA SULLINS, and
DON-SUL, INC., a California
Corporation,

        Plaintiffs,

   v.

EXXON/MOBIL CORPORATION,

        Defendant.

_____/

No. 08-04927 CW

ORDER GRANTING,
IN PART, AND
DENYING, IN PART,
DEFENDANT'S
MOTION FOR
SUMMARY JUDGMENT

This case is based on the allegations that, during the time Defendant Exxon Mobil Corporation owned the real property now owned by Plaintiffs, underground storage tanks leaked, contaminating the property, and that Defendant refuses to contribute to the cost of remediating the property. Defendant moves for summary judgment on three of the four claims in Plaintiffs' Third Amended Complaint (TAC): (1) liability under the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6972(a)(1)(B) (RCRA Subsection B); (2) contribution; and (3) indemnity. Defendant does not seek summary judgment on Plaintiffs' claim for continuing nuisance. Plaintiffs oppose the motion and Defendant has replied. The motion was heard on June 10, 2010. Having considered oral argument and

all the papers filed by the parties, the Court hereby grants, in part, the motion for summary judgment.

BACKGROUND

Plaintiffs Carlton and Rita Sullins (the Sullinses) are the sole shareholders of Plaintiff Don-Sul, Inc., owner of the real property located at 187 N. L Street, Livermore, California (the property).  Plaintiffs purchased the property in 1972 and operated an equipment rental business, Arrow Rentals, on it from 1972 to 2009.  Sometime before Plaintiffs purchased the property, Defendant operated a Mobil-branded gas station on it and installed five underground storage tanks (USTs).  After Plaintiffs purchased the property, the City of Livermore fire department required them to remove three of the five USTs because they were leaking.  Sometime later, the City of Livermore and the County of Alameda, Department of Environmental Health Services, Environmental Protection Division (ACEH) concluded that the soil and groundwater on the property contained hazardous materials and ordered Plaintiffs and Defendant, as responsible parties, to develop and implement a remediation plan.

Plaintiffs have hired several consultants to investigate the contamination on the property, to report to the governmental agencies and to prepare a remediation plan.  Gonzalez Dec., Ex. A (Response to Interrogatories).  Plaintiffs have applied to the State Water Resources Control Board's Underground Storage Tank Fund (UST Fund) for reimbursement of the fees they have paid to consultants, but it will not cover the full remediation costs.  Rita Sullins Depo. at 145.  Defendant has made no effort to

2

United States District Court
For the Northern District of California

investigate or remediate the property and has not contributed to Plaintiffs' efforts to comply with the regulatory agencies' clean-up orders.  Rita Sullins Depo. at 163; Rita Sullins Dec. ¶ 4.

On April 30, 2001, Aquifer Sciences, Inc. (ASI) prepared a "Revised Human Health Risk Assessment" of the property on behalf of Plaintiffs.  Roy Dec., Ex. 2.  ASI identified chemicals of concern (COC) in the soil to be total petroleum hydrocarbons quantified as gasoline, diesel, benzene, toulene, ethylbenzene, xylenes, naphthalene and phenol.  Ex. 2 at 5.  ASI detected the following COCs in the groundwater: gasoline, diesel, methyl tertiary butyl ether (MTBE), naphthalene and 2-methylnaphthalene.  Ex. 2 at 4. ASI explained that the relevant exposure pathways for these types of chemicals are through inhalation of vapors from soil or groundwater; ingestion of groundwater; and dermal contact with groundwater.  Ex. 2 at 6.  After explaining its investigatory techniques and findings, ASI concluded, "Based upon the soil vapor data, no remediation should be necessary to address the indoor air inhalation scenario for onsite commercial or residential development. . . Based upon existing conditions, no soil or groundwater remediation is necessary for offsite exposure scenarios."  Ex. 2 at 10, 11.  ASI also concluded, "Based upon the distance to nearby wells, contamination on the site is not impacting any known water supply wells."  Ex. 2 at 13.  However, ASI concluded that, although onsite risks due to outdoor air inhalation were within acceptable levels, the baseline risks associated with indoor air inhalation and groundwater ingestion exceeded acceptable limits.  Ex. 2 at 10.  If commercial or

3

residential development were to take place on the property, ASI recommended reducing the benzene, toluene and ethylbenzene levels of concentration in the groundwater.  Ex. 2 at 11-12.  ASI also concluded that, if the property were not developed for commercial or residential use, no remediation would be necessary because, "with appropriate institutional controls in place (a restriction on the use of groundwater and a deed notification for possible future development), soil and groundwater remediation may not be necessary.  Over time, natural biodegradation and attenuation could reduce concentrations of the contaminants to levels less than remediation goals."  Ex. 2 at 14.  ASI recommended placing deed restrictions on the property to prevent use of the groundwater, placing notification of the deed restriction on file with the Livermore Building Department so that it could evaluate any proposed project with respect to potential exposure to contamination, and continuing to collect groundwater samples from monitoring wells annually until the concentration levels of the COCs reach remediation goals.  Ex. 2 at 14.

On April 26, 2005, ASI wrote to ACEH requesting closure of the case, so that the property would no longer be subject to any clean-up order.  In the letter, ASI summarized the findings and conclusions noted above, and indicated that deed restrictions on the property would be sufficient to account for any potential health hazard from future development.  Roy Dec., Ex. 4 at 5.

In a letter dated May 2, 2005, ACEH explained that, before it could close the case, it required more documentation that the site met certain low risk requirements: (1) the leak was stopped and on-

4

going source product removed; (2) the site was adequately characterized; (3) the plume was not migrating; (4) no sensitive receptors were impacted; (5) there was no significant risk to human health; (6) there was no significant risk to the environment; and (7) water quality objectives were to be achieved within a reasonable time frame. Roy Dec., Ex. 6.

On August 8, 2005, in response to ACEH's letter, ASI submitted a supplemental report and again requested closure of the site. Roy Dec., Ex. 5. ASI explained that the ground water that is currently used in the vicinity is obtained from depths greater than 100 feet; because the contamination at the site extends less than sixty feet below grade and less than 100 feet offsite to the west, contamination at the site is not impacting any known water supply wells. Roy Dec., Ex. 5 at 7, 9. ASI concluded, "The analytical data further show that, if left undisturbed, residual contamination in soil, soil vapor and groundwater beneath the site should not adversely impact human health or the environment." Roy Dec., Ex. 5 at 9. ASI again recommended deed restrictions to limit future development of the property and to enable the City of Livermore to evaluate any proposed project with respect to potential exposure to residual contamination. Roy Dec., Ex. 5 at 10.

On March 1, 2006, the City of Livermore ordered Plaintiffs and Defendant, as responsible parties for the contamination of the property, to prepare a corrective action plan and remediate the property. Rita Sullins Dec. at ¶ 2, Ex. A, City of Livermore letter addressed to the Sullinses and Defendant. In the letter, the City of Livermore explained:

**United States District Court**
For the Northern District of California

Redevelopment of the downtown area is a priority for the City of Livermore.  The Downtown Specific Plan, adopted in the spring of 2004, describes the proposed redevelopment of the downtown.  Arrow Rentals is located in the Downtown Livermore Redevelopment Project Area. Accordingly, the Livermore Redevelopment Agency (Agency) is diligently working to facilitate the reuse and revitalization of this blighted area.  To that end, the Agency is working with owners of contaminated properties and the regulatory agencies to ensure that these properties are cleaned up in a timely and efficient manner and that the properties are cleaned up to a proper level to allow for redevelopment uses identified in the Downtown Specific Plan.

On July 27, 2006, the ACEH separately ordered Plaintiffs and Defendant to prepare a corrective action plan and remediate the Property.  Rita Sullins Dec. at ¶ 3, Ex. B.

On August 1, 2007, a new consultant for Plaintiffs, Geological Technics, Inc. (GTI), submitted a Final Corrective Action Plan (CAP) to ACEH and the City of Livermore.  Roy Dec., Ex. 8.  GTI listed five COCs that were found on the Property and noted that their level of concentration in the groundwater exceeded the standards set by the San Francisco Bay Regional Water Quality Control Board (SFBRWQCB).  Roy Dec., Ex. 8 at 13.  GTI suggested three alternative plans for reducing the level of the COCs in the groundwater.  The first alternative was "Monitored Natural Attenuation," which required the long term monitoring of the groundwater conditions with the lessening of the COC concentrations due to natural physical processes such as advection and dispersion, or through biological degradation processes.  In regard to the concerns and limitations of this plan, GTI wrote:

The site poses negligible threat to human health since there are no wells within the boundaries of the groundwater plume to act as a conduit to human receptors. Achieving site closure therefore depends on reducing

6

> groundwater concentrations within a timeframe acceptable to the appropriate regulatory agencies.  It is apparent from the site's historical groundwater monitoring that monitored natural attenuation will be too slow and is not a feasible option.

Roy Dec., Ex. 8 at 13-14.

GTI recommended that the dual phase extraction (DPE) plan be implemented to abate the COCs on the property.  Roy Dec., Ex. 8 at 16.  The DPE plan involved the use of soil vapor extraction and groundwater extraction simultaneously from one well.  Id.  GTI noted that it had developed a work plan to implement the DPE, which the ACEH had approved.  Id.

In a letter summary of its January 31, 2008 interim report, GTI wrote, "The groundwater data . . . indicate that the plume continues to display a trend of declining concentrations.  However, an elevated core of gasoline contamination persists in the location of the former USTs/piping."  Roy Dec., Ex. 10, cover letter.  In its conclusions, GTI wrote, "The center of the plume has not migrated beyond the source area providing evidence that the plume is degrading as it migrates laterally by advective flow.  The data shows that the core of the plume is fairly stable, with concentrations decreasing very slowly by either biodegradation causes or by dilution effects."  Roy Dec, Ex. 10 at 7.  GTI recommended maintaining the semi-annual monitoring schedule and implementing the DPE plan as soon as cost pre-approval was received from the UST Cleanup Fund.  Roy Dec., Ex. 10 at 7-8.  One year later, in its December 9, 2008 interim report, GTI presented the same findings and recommendations.  Roy Dec., Ex. 11 at 7.

In a July 30, 2008 letter to the ACEH, Ms. Sullins appealed

its decision requiring remediation of the property.  Roy Dec., Ex. 12.  Ms. Sullins stated:

> Over these many, many years, various geologists have provided Alameda County with all the information available regarding the danger to human health, and the possibility of contamination to wells that may be in the vicinity of our property.  To our knowledge, and according to all the reports we have read, we can find absolutely no risk to any wells ANYWHERE.
>
> If you look at all the monitoring mandated by Alameda County that has gone on over these past 20 years, you will see that the actual plume has <u>decreased</u> in size. And not only that, but the whole area is <u>less</u> <u>contaminated</u>.  The fact that there are levels of contamination that may exceed governmental standards is in itself, no reason to remediate.  Only if those levels can be shown to pose some threat now (which there is not), or can be shown to migrate such as to cause some threat (which it has not), can there be justification to remediate.

Roy Dec., Ex. 12 (emphasis in original).

In a September 4, 2008 letter, the ACEH indicated that it had reviewed Ms. Sullins' letter requesting case closure and denied the request.  Rita Sullins Dec., Ex. C.  The ACEH provided the following reasoning for keeping the case open:

> Your site is located within the Livermore-Amador Groundwater Basin where groundwater is currently used as a source of drinking water.  We do not believe that the requisite level of drinking water quality will be attained within a reasonable time period at your site. Although unauthorized releases occurred at the site more than 20 years ago, highly elevated concentrations of petroleum hydrocarbons still remain in soil and groundwater beneath the site.  Restoration of water quality to the requisite drinking water quality by natural attenuation processes is likely to require several additional decades or longer.  Given the potential for groundwater use within the Livermore-Amador Groundwater Basin, we do not believe this long-term degradation of water quality in this area of the basin is justified.  Therefore, your case cannot be closed at this time.

8

Rita Sullins Dec., Ex. C at 2.[1]

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an

---

[1]Defendant's evidentiary objections to the governmental letters based on relevance and hearsay are overruled; they are relevant and they are excepted from the hearsay rule under Federal Rules of Evidence 803(8) and 807.

9

United States District Court

For the Northern District of California

issue at trial, the moving party may discharge its burden of

production by either of two methods:

> The moving party may produce evidence negating an
> essential element of the nonmoving party's case, or,
> after suitable discovery, the moving party may show that
> the nonmoving party does not have enough evidence of an
> essential element of its claim or defense to carry its
> ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d

1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an

absence of evidence to support an essential element of a claim or

defense, it is not required to produce evidence showing the absence

of a material fact on such issues, or to support its motion with

evidence negating the non-moving party's claim.  Id.; see also

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v.

NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the

moving party shows an absence of evidence to support the non-moving

party's case, the burden then shifts to the non-moving party to

produce "specific evidence, through affidavits or admissible

discovery material, to show that the dispute exists."  Bhan, 929

F.2d at 1409.

If the moving party discharges its burden by negating an

essential element of the non-moving party's claim or defense, it

must produce affirmative evidence of such negation.  Nissan, 210

F.3d at 1105.  If the moving party produces such evidence, the

burden then shifts to the non-moving party to produce specific

evidence to show that a dispute of material fact exists.  Id.

If the moving party does not meet its initial burden of

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. <u>Id.</u> This is true even though the non-moving party bears the ultimate burden of persuasion at trial. <u>Id.</u> at 1107.

EVIDENTIARY OBJECTIONS

Defendant objects to certain evidence presented by Plaintiffs. The Court has reviewed these evidentiary objections and has not relied on any inadmissible evidence.  The Court will not discuss each objection individually.  To the extent that the Court has relied on evidence to which Defendant objects, such evidence has been found admissible and the objections are overruled.

DISCUSSION

A. RCRA Subsection B

Defendant argues that Plaintiffs' RCRA Subsection B claim is deficient because they fail to establish that there is an imminent and substantial endangerment to health or the environment.

RCRA Subsection B provides that any person may commence a civil action

> (B) against any person, . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment;

42 U.S.C. § 6972(a)(1)(B).

In <u>Mehrig v. K.C. Western, Inc.</u>, 516 U.S. 479, 480 (1996), the Supreme Court determined that this language meant that "an endangerment can only be 'imminent' if it threatens to occur

11

immediately . . . This language implies that there must be a threat which is present _now_, although the impact of the threat may not be felt until later." (emphasis in original).

In _Price v. United States Navy_, the Ninth Circuit clarified the meaning of Subsection B's "imminent and substantial endangerment" requirement:

> A finding of "imminency" does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present. "An imminent hazard may be declared at any point in a chain of events which may ultimately result in harm to the public." Imminence refers "to the nature of the threat rather than identification of the time when the endangerment initially arose." Moreover, a finding that an activity may present an imminent and substantial harm does not require actual harm. Courts have also consistently held that endangerment means a threatened or potential harm and does not require proof of actual harm.

_Price_, 39 F.3d 1011, 1019 (9th Cir. 1994). The _Price_ court also required that the plaintiff show that "there must be some necessity for the action." _Id._

Following _Price_, district courts in the Ninth Circuit have interpreted "imminent and substantial endangerment" liberally. "Because the word 'may' precedes the standard of liability, Congress included expansive language intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes." _California Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp._, 298 F. Supp. 2d 930, 980 (E.D. Cal. 2003). Moreover, "substantial" does not require quantification of the endangerment. _Id._ "Endangerment is substantial if there is some reasonable cause for concern that someone or something may be

exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken." Id.

Defendant argues that Plaintiffs cannot make the showing necessary to establish a substantial and imminent endangerment to health or the environment because admissions made by Plaintiffs and their professional consultants demonstrate that no such endangerment will result from contamination on the property.

As Defendant points out, Plaintiffs' consultants have consistently found that the contamination on the property does not constitute a present harm: (1) it is not impacting any known water supply wells, see Roy Dec., Ex. 2, ASI Report at 5; (2) the contaminant plume is stable, extending less than sixty feet below grade and less than 100 feet offsite, see Roy Dec., Ex. 5, ASI Report at 9; (3) if left undisturbed, residual contamination in soil, soil vapor and groundwater will not adversely impact human health or the environment, see id.; and (4) the site poses negligible threat to human health since there are no wells within the boundaries of the groundwater plume to act as a conduit to human receptors, see Roy Dec., Ex. 8, GTI CAP Report at 13. And Plaintiffs themselves have argued to the ACEH that, "according to all the reports we have read, we can find absolutely no risk to any wells anywhere."

However, Defendant ignores the fact that the consultants' reports consistently concluded that the property contains COCs in concentrations that exceed the standards set by the SFBRWQCB for drinking water so that, if the property were developed and the groundwater were to be used, remediation of the groundwater would

13

United States District Court
For the Northern District of California

be necessary.  See Roy Dec., Ex. 2, April 30, 2001 ASI Report at 9, 10, 11.  If remediation were not undertaken, deed restrictions would be necessary to ensure that the groundwater was not used for drinking.  See Roy Dec., Ex. 2, April 30, 2001 ASI Report at 8, 9, 11 and 12 (indoor air and groundwater ingestion scenarios for commercial or residential development exceed allowable risk; if there is no remediation, deed restrictions on the property are necessary to prevent extraction of groundwater for agricultural, domestic, commercial, industrial or municipal purposes); Ex. 4, April 26, 2005 ASI Request for Case Closure (case closure requires deed restrictions preventing future development); Ex. 5, August 5, 2005 ASI Report at 10 (requiring same deed restrictions).  Based on ASI's reports, the contamination on the property does not constitute a danger to health or the environment so long as the property is not developed for any use other than its present use and the groundwater on the property is not used for any purpose.  However, as indicated by the City of Livermore, the property is located in the City's redevelopment zone which has been targeted to be revitalized by developing the properties located therein with re-development uses that were identified in the City's Downtown Specific Plan.  Thus, the City of Livermore's redevelopment goal is in direct conflict with ASI's recommendation that deed restrictions preventing development be placed on the property.  Based on ASI's conclusions, if the property were to be developed, the contamination would pose a substantial and imminent risk to health and the environment.

Additionally, in its September 4, 2008 letter explaining why

14

it denied Plaintiffs' request for case closure, ACEH indicated that, although groundwater on the property is not now used for drinking water, the property is located in the Livermore-Amador Basin where the groundwater is used for drinking and, thus, groundwater on the site could potentially be used for drinking water.  Although ACEH's letter does not indicate a specific time-frame for using the groundwater on the property as drinking water, it implies that it wants to have the option to do so in the near future.  Thus, ACEH required the parties to develop and implement a remediation plan.

Taking Plaintiffs' evidence in the light most favorable to them, the Court finds that it raises a triable issue of fact sufficient to withstand a motion for summary judgment.  To make a showing of substantial and imminent danger, Plaintiffs are not required to show actual harm or to quantify the threat of danger. They merely must show that "someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken."  See California Dep't of Toxic Substances Control, 298 F. Supp. 2d at 980.  If the redevelopment of the property takes place, as the City of Livermore and ACEH indicate it must, someone or something will be exposed to a risk of harm by a release of a hazardous substance if remedial action is not taken beforehand.  Furthermore, the City of Livermore and ACEH's future plans for the property fulfill the Price requirement that there must be some necessity for the action taken; if the contamination on the property is not remediated and the property is redeveloped, the contamination will cause harm to

1   health and the environment.

2       Defendant's cases are distinguishable because none of them
3   involves a situation where a government agency targeted the
4   contaminated site for development and thus ordered the property
5   owner to take corrective action; they address situations where
6   contamination was stable or contained, so that, if left alone, it
7   would not cause danger.  See e.g., Two Rivers Terminal, L.P. v.
8   Chevron USA, Inc., 96 F. Supp. 2d 432, 444 (M.D. Pa. 2000)
9   (contaminated site not subject to governmental cleanup order);
10  Foster v. United States, 922 F. Supp. 642, 661-62 (D.D.C. 1996)
11  (contaminated site not subject to government cleanup order and no
12  plans for development); Davies v. Nat'l Co-op Refinery Ass'n, 963
13  F. Supp. 990, 999-1000 (D.Kan. 1997) (although abstaining from
14  taking jurisdiction over RCRA claim, court noted contaminated water
15  on property not a risk to tenants who used bottled water and plume
16  of contaminated water not expanding).

17      In contrast, the contamination on the property here will not
18  remain undisturbed because the City of Livermore has targeted the
19  property for redevelopment and ACEH has required the availability
20  of the property's groundwater as part of the County's drinkable
21  water supply.  Therefore, Defendant's motion for summary judgment
22  on the RCRA Subsection B claim is denied.

23  II. Contribution

24      California Civil Procedure Code § 875 provides, in relevant
25  part:

26      (a) Where a money judgment has been rendered jointly
        against two or more defendants in a tort action there
27      shall be a right of contribution among them as

28                          16

1    hereinafter provided.

2    (b) Such right of contribution shall be administered in
     accordance with principles of equity.

3

4    (c) Such right of contribution may be enforced only after
     one tortfeasor has, by payment, discharged the joint
5    judgment or has paid more than his pro rata share
     thereof.

6       Contribution is a right created by statute that provides for

7    the distribution of a loss equally among all tortfeasors. <u>Coca-</u>

8    <u>Cola Bottling Co. v. Lucky Stores, Inc.</u>, 11 Cal. App. 4th 1372,

9    1378 (1992). The right comes into existence only after the

10   issuance of a judgment declaring more than one defendant jointly

11   liable to the plaintiff. <u>Id.</u> (citing Cal. Civ. Pro. Code § 875).

12      Defendant argues that Plaintiffs' contribution claim fails

13   because no judgment has been entered against Plaintiffs and

14   Defendant. Plaintiffs do not assert that a judgment has been

15   rendered; instead, they argue that a final cleanup order from a

16   regulatory agency is functionally equivalent to a judgment. They

17   reason that, because ACEH has ordered both Plaintiffs and Defendant

18   to remediate the property, Plaintiffs are entitled to contribution

19   from Defendant for its fair share of the costs of complying with

20   that order. However, Plaintiffs fail to provide any authority for

21   this theory and, thus, cannot overcome the statutory requirement

22   that a claim for contribution is not cognizable unless a money

23   judgment has been rendered.

24      Therefore, summary judgment is granted in favor of Defendant

25   on Plaintiffs' claim for contribution under California Code of

26   Civil Procedure § 875.

27      Plaintiffs also argue that they are entitled to equitable

28                              17

contribution under California Civil Code § 1432, which provides that a party to a joint, or joint and several obligation, who satisfies more than its share of the claim against all, may require a proportionate contribution from all the parties joined with it. Defendant argues this claim fails because § 1432 applies only where the parties have a pre-existing contractual relationship.

The right to contribution under § 1432 is based on principles of equity. Morgan Creek Residential v. Kemp, 153 Cal. App. 4th 675, 684 (2007). Although it is necessarily related to a former transaction or obligation, the right to contribution exists as a separate contract implied by law. Id. Where two or more parties are jointly liable on an obligation and one of them makes payment of more than its share, the one paying comes into possession of a new obligation against the others for their proportion of what it has paid for them. Id. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by co-obligors and to prevent one obligor from benefitting at the expense of others. Id.

Citing County of Tulare v. County of Kings, 117 Cal. 195, 202 (1897), for the proposition that § 1432 presupposes some sort of contractual relationship between the parties, Defendant argues that this claim fails because Plaintiffs do not identify any kind of pre-existing relationship between the parties that would warrant the application of § 1432.

Although the right to contribution usually arises between parties who have entered into a transaction or contractual relationship with each other, neither § 1432 nor the cases

18

interpreting it require, as Defendant urges, that there be a previous contractual relationship. The statute merely requires that the parties be connected by a joint obligation. The clean-up order issued by ACEH is addressed to both Plaintiffs and Defendant as parties who are jointly responsible for the remediation of the property. The Court finds that the clean-up order constitutes the joint obligation required under § 1432. This result satisfies the equitable purpose of § 1432, to accomplish substantial justice by equalizing the common burden shared by co-obligors and to prevent one obligor from benefitting at the expense of others. If § 1432 did not apply, Defendant could do nothing while Plaintiffs complied with ACEH's cleanup order and Plaintiffs would be forced to carry the entire burden alone.

Therefore, Defendant's motion for summary judgment on Plaintiffs' claim for equitable contribution under § 1432 is denied.

III. Equitable Indemnity

The right to equitable indemnity arises from the principle that an individual who has paid damages which ought to have been paid by another wrongdoer may recover from that wrongdoer. Bush v. Sup. Ct., 10 Cal. App. 4th 1374, 1380 (1992). It is premised on the doctrine that joint tortfeasors should share the burden of discharging their legal obligation to the injured party for damages caused by mutual negligence or wrongdoing. Miller v. Ellis, 103

19

Cal. App. 4th 373, 379-80 (2002).[2]  The cause of action for equitable indemnity accrues when the indemnitee suffers a loss through payment of an adverse judgment or settlement.  Western Steamship Lines, Inc. v. San Pedro Peninsula Hosp., 8 Cal. 4th 100, 110 (1994).

Defendant argues that Plaintiffs' indemnity cause of action cannot stand because there has been no judgment or settlement rendered in this case.  Plaintiffs do not dispute the fact that there has been no judgment or settlement, but argue that neither a judgment nor settlement is necessary.  Citing Gouvis Engineering v. Sup. Ct., 37 Cal. App. 4th 642, 647-48 (1995), Plaintiffs argue the elements of a cause of action for indemnity are (1) a showing of fault on the part of the indemnitor and (2) resulting damages to the indemnitee for which the indemnitor is contractually or equitably responsible.  On this basis, they conclude that a judgment or settlement is not a necessary element of the cause of action.  However, in Gouvis Engineering, a settlement of a lawsuit had been paid by a number of responsible parties and the issue was whether it was a good faith settlement.  Id. at 645.  Therefore, the court's explication of the elements of an indemnity claim presupposed that a settlement had been paid.

Plaintiffs also quote from People ex rel. Dep't of Transp. v. Sup. Ct., 26 Cal. 3d 744, 751-52 (1980), that the indemnity claim

---

[2]The distinction between contribution and indemnity is that indemnity imposes the entire loss on one of two or more tortfeasors or apportions it on the basis of comparative fault whereas contribution distributes the loss equally among all tortfeasors. Western Steamship Lines, Inc. v. San Pedro Peninsula Hosp., 8 Cal 4th 100, 108 n.6 (1994); 14A Cal. Jur. 3d, § 90 (2008).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

"accrues at the time the indemnity claimant suffers loss or damage, that is, at the time of payment of the underlying claim, payment of a judgment thereon, or payment of a settlement thereof by the party seeking indemnity."  Plaintiffs contend that the fact that the court mentioned payment of a "claim" supports their view that a judgment or settlement is not necessary.  However, earlier in its opinion, the court noted that an indemnity claim does not accrue until "the tort defendant pays a judgment or settlement as to which he is entitled to indemnity."  Id. at 748.  Plaintiffs' argument that use of the word "claim" instead of "judgment" means a judgment or settlement is not needed is unpersuasive.  In the opinions Plaintiffs cite, the courts first refer to the necessity for payment of judgment or settlement; when later in the opinion they refer to payment of a "claim," they harken back to the first mention of a judgment or settlement.  Along the same line, Plaintiffs' attempt to create a distinction between an "actual loss" and "a judgment or settlement" is unpersuasive.

Furthermore, Plaintiffs' argument that the language Defendant quotes from Western regarding payment of a judgment or a settlement is dicta is not persuasive.  See Gypsum, 20 Cal. App. 4th at 587 (California Supreme Court "has consistently ruled that a cause of action for indemnity does not accrue until the indemnitee suffers loss through payment of an adverse judgment or settlement").

Therefore, summary judgment is granted in favor of Defendant on this claim.

CONCLUSION

For the foregoing reasons, Defendant's motion for summary

21

judgment is denied on the RCRA Subsection B claim and the equitable contribution claim and is granted on the claims for statutory contribution and indemnity.

IT IS SO ORDERED.

Dated: June 14, 2010

_____
CLAUDIA WILKEN
United States District Judge