IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLTON A. SULLINS, et al.,<br><br>            Plaintiffs,<br><br>   v.<br><br>EXXON/MOBIL CORPORATION,<br><br>            Defendant.<br>_____/ | No. 08-04927 CW<br><br>ORDER DENYING DEFENDANT'S RULE 50 MOTION AND ITS MOTION FOR A HEARING; FINDINGS OF FACTS AND CONCLUSIONS OF LAW AFTER BENCH TRIAL |

    Plaintiffs Carlton A. Sullins, Rita Sullins and Don-Sul, Inc. (collectively, the Sullinses) initiated this action seeking to recover damages, cleanup costs and a cleanup injunction resulting from environmental contamination on their property allegedly caused by Defendant Exxon/Mobil Corporation (Exxon Mobil).  The matter proceeded to a jury trial on Plaintiffs' nuisance claim.  The jury found that Defendant had caused contamination on Plaintiffs' property but that the contamination did not substantially and unreasonably interfere with Plaintiffs' use and enjoyment of the property.  Thus, the jury returned a verdict in favor of Defendant. Thereafter, a bench trial was held on Plaintiffs' remaining two equitable claims for violation of 42 U.S.C. § 6972(a)(1)(B), the Resource Conservation and Recovery Act (RCRA), and equitable contribution under California Civil Code § 1432.  After the close of Plaintiffs' evidence at the bench trial, Defendant made a motion

under Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law on the RCRA and equitable contribution claims. At the end of the bench trial, the Court ordered the parties to submit closing arguments in writing. The Court noted that the significant issue on the RCRA claim was whether the contamination on the property posed a substantial and imminent endangerment to health or the environment. Reporter's Transcript (RT) at 832. The Court also noted that the significant issues on the equitable contribution claim was whether the cleanup orders issued by the Alameda County Department of Environmental Health (ACEH) addressed to Defendant and Plaintiffs are orders having the force of law, and create a joint obligation upon the parties, as required for an equitable contribution claim. If so, Defendant's fair share of the cleanup costs would be at issue. RT at 805-06, 832.

    The parties have submitted their briefs. Defendant has moved for oral argument on these matters. Having considered all the papers submitted by the parties, the Court denies Defendant's Rule 50 motion and motion for a hearing. The Court finds and concludes that Plaintiffs have not proved by a preponderance of the evidence that the contamination on their property poses a substantial and imminent endangerment to health or the environment. The Court also finds and concludes that the cleanup orders create a joint obligation upon the parties but that Plaintiffs have failed to prove by a preponderance of the evidence that they have paid more than their fair share of that obligation.

2

# FINDINGS OF FACT

Carleton and Rita Sullins, through their corporation Don-Sul, Inc., are the owners of the real property located at 187 North L. Street, Livermore, California. Plaintiffs purchased the property in 1972 and operated an equipment rental business, Arrow Rentals, on it from 1972 to 2009. Sometime prior to 1972, a Mobil-branded gas station was operated on the property. During that time, five underground storage tanks (USTs) were installed and operated on the property: three 1,500 gallon tanks, one 4,000 gallon tank and one 6,000 tank, and the associated underground piping.

Plaintiffs removed the three 1,500 gallon tanks shortly before closing on their purchase of the property. In 1984, they removed the two remaining tanks and installed one new 1,000 gallon tank for use in their business. Plaintiffs removed this tank in 1993.

The soil and the groundwater on the property is contaminated with gasoline-type petroleum hydrocarbons which emanated from two sources: (1) releases from the USTs and the connecting pipelines and (2) a spill, in 1985, by Plaintiffs' contractor, Pitcock Petroleum, when it mistakenly delivered 600 gallons of gasoline into a monitoring well instead of into a UST. RT at 439 (testimony of Plaintiffs' expert, Dr. Raymond Kablanow).

Sometime after Plaintiffs purchased the property, the City of Livermore and the ACEH concluded that the soil and groundwater on the property contained hazardous materials and ordered Plaintiffs and Defendant, as responsible parties, to develop and implement a remediation plan. Plaintiffs have hired several consultants to investigate the contamination on the property, to report to the

3

governmental agencies and to prepare a remediation plan. Plaintiffs have applied to the State Water Resources Control Board's Underground Storage Tank Fund (UST Fund) for reimbursement of the fees they have paid to consultants. The parties agree that the UST Fund has paid for approximately eighty-five percent of the remediation costs. Defendant has made no effort to investigate or remediate the property and has not contributed to Plaintiffs' efforts to comply with the regulatory agencies' cleanup orders.

CONCLUSIONS OF LAW

I. Rule 50 Motion

Federal Rule of Civil Procedure 50(a) provides:

> (1) If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Because the claims at issue here are equitable and have been tried to the Court in a bench trial, Rule 50, which applies to jury trials, is not applicable. Therefore, Defendant's Rule 50 motion is denied.

II. RCRA Claim

RCRA subsection B provides that any person may commence a civil action

> (B) against any person, . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage,

4

>treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . .

42 U.S.C. § 6972(a)(1)(B).

    A.    Generator, Transporter, Owner or Operator Who Contributed to Past Handling, Storage, Treatment, Transportation or Disposal of Hazardous Waste

Defendant argues that Plaintiffs have failed to set forth evidence that it owned or operated the USTs on the property or contributed to the contamination. Defendant points out that the only evidence of ownership of the property prior to 1972 is that it was owned by Mona Holm, an unrelated third party. RT at 279:11-13. Defendant argues that, although Plaintiffs may have established that there was a Mobil-branded gas station on the property prior to 1972, they have not established that Mobil owned or operated that gas station. Defendant posits that many service stations are operated by independent dealers who sell gasoline branded by a particular oil company and the service station on Plaintiffs' property might have been of that ilk. Defendant contends that supplying gasoline to the operator of a gas station would not create RCRA liability because it does not meet the requirement that a defendant has contributed to the handling, storage, treatment, transportation or disposal of any hazardous waste.

The phrase "contributed to" in RCRA requires some degree of causation of the contamination by the party to be held liable. Hinds Investments, L.P. v. Team Ents., Inc., 201 WL 922416, *10 (E.D. Cal.); California Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp., 298 F. Supp. 2d 930, 979 (E.D. Cal.

5

2003). "Contributed to" means that some affirmative action is required on the part of the defendant, rather than merely passive conduct. Sycamore Indus. Park Assocs. v. Ericsson, Inc., 546 F.3d 847, 854 (7th Cir. 2008).

Plaintiffs point to the following evidence which, they argue, establishes that Defendant operated the Mobil gas station on the property and contributed to the contamination. Mr. Sullins testified that, from 1961 to 1965, he was employed by Mobil Oil Company as a fuel truck dispatcher and, in that role, he dispatched fuel to a Mobil station on the property. RT 241:12-18, 242:6-9. Mr. Sullins testified that, when he and his former business partner acquired the property in 1972, he removed the existing fuel pumps, which were red--Mobil's trademark color. RT 255:15-25; 256:1. Mr. Sullins also testified that, when he took possession of the property in 1972, he found a plaque on the office wall, dated 1961, which stated, "John Bowersox, we are pleased you have completed ten years as a Mobil dealer. . . ." and was signed by a Division Manager of Mobil Oil Company. RT at 258:20-260:3; Exh. 5. Plaintiffs point to a June 5, 2006 letter from Hany Fangary, Defendant's counsel, regarding "Former Mobil LIV, 187 North L Street, Livermore, California." Exh. 205. In this letter, Mr. Fangary summarized his research of the past ownership of the property. Id. He stated that, based on his review of the grant deeds and title to the property, he found that it was originally owned by S.C. and K.O. Buck, who, in 1948, sold it to Leslie Holm. In 1960, Leslie Holm sold it to Mona Holm. Mona Holm owned the property from 1960 to 1972, when it was purchased by G.R. Donelly,

6

Mr. Sullins' business partner.  Id.  Mr. Fangary wrote, "The Property operated as a Mobil service station from 1951 to 1969. . . . Five USTs were located onsite during the former Mobil station operations: three 1,500 gallon, one 4,000 gallon, and one 6,000 gallon."  Id.

Finally, Plaintiffs point to the testimony of Albert Ridley, an engineering geologist, who was retained by the City of Livermore to evaluate the property and the entire city block on which it is located.  RT 158:8-15.  Mr. Ridley testified that, as part of his investigation of the property, he went to the City of Livermore's Building Department and found a record of a 1960 building permit by Socony Mobil to install an underground storage tank on the property and a fee paid for the permit.  RT 231:7-25.

The Court finds as a matter of fact that this evidence shows that Defendant operated a Mobil gas station on the property between 1951 and 1969 and, during that time, utilized the five USTs that are at issue here.  The fact that Mobil obtained the building permit for one of the USTs can only mean it was responsible for installing and operating it.  Furthermore, Defendant submits no evidence in support of its theory that it merely supplied gasoline to an independent dealer.

The Court finds, as did the jury, that Plaintiffs established by a preponderance of the evidence that the contamination on the property was caused, in part, by leaking USTs.

B.   Substantial and Imminent Endangerment

In Meghrig v. K.C. Western, Inc., 516 U.S. 479, 480 (1996), the Supreme Court determined that "an endangerment can only be

7

'imminent' if it threatens to occur immediately . . . This language implies that there must be a threat which is present <u>now</u>, although the impact of the threat may not be felt until later." (emphasis in original).

In <u>Price v. United States Navy</u>, the Ninth Circuit clarified the meaning of subsection B's "imminent and substantial endangerment" requirement:

> A finding of "imminency" does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present. "An imminent hazard may be declared at any point in a chain of events which may ultimately result in harm to the public." Imminence refers "to the nature of the threat rather than identification of the time when the endangerment initially arose." Moreover, a finding that an activity may present an imminent and substantial harm does not require actual harm. Courts have also consistently held that endangerment means a threatened or potential harm and does not require proof of actual harm.

39 F.3d 1011, 1019 (9th Cir. 1994). The endangerment must be substantial or serious, and "there must be some necessity for the action." <u>Id.</u>

Following <u>Price</u>, district courts in the Ninth Circuit have interpreted "imminent and substantial endangerment" liberally. "Because the word 'may' precedes the standard of liability, Congress included expansive language intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes." <u>California Dep't of Toxic Substances Control v. Interstate Non-Ferrous Corp.</u>, 298 F. Supp. 2d 930, 980 (E.D. Cal. 2003). Moreover, "substantial" does not require quantification of the endangerment. <u>Id.</u> "Endangerment is substantial if there is some

8

reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken." Id.

However, "there is a limit to how far the tentativeness of the word may can carry a plaintiff." Crandall v. City and County of Denver, Colorado, 594 F.3d 1231, 1238 (10th Cir. 2010) (emphasis in original). Thus, the endangerment cannot be merely possible, but must "threaten to occur immediately." Id. (citing Meghrig, 516 U.S. at 485). And, there is no endangerment unless the present or imminent situation can be shown to present a risk of later harm. Id. Thus, although the harm may be in the future, the endangerment must be imminent. Id. It is not enough that, in the future, someone may do something with hazardous waste that, absent protective measures, can injure human beings. Id. at 1239. Furthermore, a showing of soil and groundwater pollution by itself does not constitute an imminent and substantial endangerment. Two Rivers Terminal, L.P. v. Chevron USA, Inc., 96 F. Supp. 2d 432, 446 (M.D. Pa. 2000); Davies v. National Cooperative Refinery Ass'n, 963 F. Supp. 990, 999-1000 (D. Kan. 1997) (although evidence showed resulting threat from high levels of contamination would be substantial, it did not establish likelihood that any person would actually be exposed to it).

Plaintiffs cite trial evidence to argue that substantial and imminent endangerment to health or the environment will result from the contamination on the property. They cite testimony from Dr. Raynold Kablanow, their expert, and Barbara Mickelson, Defendant's expert. Specifically, Dr. Kablanow testified that there is a high

9

concentration core of contamination on the property, RT at 499:3-5, that there is free product, basically pure gasoline, floating on top of the groundwater, RT at 525:17-526:20, and that "when the concentrations of dissolved gasoline gets greater than what water would--would put into solution, then a separate phase develops. A free-product phase develops," as was observed on the property, RT at 539:5-23. Dr. Kablanow also testified that there "must have been a lot [of contaminant] . . . to form a separate phase and to form a big groundwater contamination plume." RT at 569:2-6; 8-10.

Ms. Mickelson testified that more than 500 milligrams of contaminant per kilogram was detected on the property and this level of contamination would "not be allowed to be left in place without some kind of screening risk assessment" by the regulatory authorities. RT at 673:14-674:1; 644:13-19 (highest concentration measured at boring G is 12,000 milligrams per kilogram).

Plaintiffs point to Dr. Kablanow's statement, "Gasoline is not normal in the environment," to show that the environment is endangered. Plaintiffs also cite Exhibit 187, a September 4, 2008 letter from ACEH to Plaintiffs and Defendant stating that the property

> is located within the Livermore-Amador Groundwater Basin where groundwater is currently used as a source of drinking water. We do not believe that the requisite level of drinking water quality will be attained within a reasonable time period at your site. Although unauthorized releases occurred at the site more than 20 years ago, highly elevated concentrations of petroleum hydrocarbons still remain in soil and groundwater beneath the site. Restoration of water quality to the requisite drinking water quality by natural attenuation processes is likely to require several additional decades or longer. Given the potential for groundwater use within the Livermore-Amador Groundwater Basin, we do not believe

10

> this long-term degradation of water quality in this area of the basin is justified. Therefore, your case cannot be closed at this time.

Ex. 187 at 2.[1]

Defendant argues that Plaintiffs' evidence fails to prove there is a substantial likelihood of endangerment from contamination and points out that neither Dr. Kablanow nor any other witness testified to health or environmental risk. Defendant cites Dr. Kablanow's testimony that the contaminant plume is shrinking due to natural processes. RT at 445:23-446:4; 498:2-499:5 (through natural attenuation the original large plume of contamination has shrunk to the high concentration core). Defendant also cites the testimony of Eric Uranga, Assistant Director of Community Development for the City of Livermore, that the property is not specifically mentioned in the City of Livermore's five year development plan and that properties in downtown Livermore do not pump their own drinking water. RT at 842:11-843:15, 844:16-18.

Plaintiffs have failed to prove by a preponderance of the evidence that the contamination on the property may present an imminent and substantial endangerment to health or the environment.

---

[1] Defendant objects on hearsay grounds to the admission of Exhibit 187 and all letters from ACEH and the City of Livermore. At trial, the Court admitted these letters as proof that they were sent and received, not as proof of the matters asserted therein. RT 797:20-22; 798:21-25. Plaintiffs argue that the letters are admissible under Rules 803(8) and 807 of the Federal Rules of Evidence, which provide a hearsay exception for public records and reports and a residual hearsay exception. The Court admits Exhibit 187 and the other regulatory letters under both hearsay exceptions. However, as explained below, Plaintiffs mischaracterize the meaning of Exhibit 187; it does not aid Plaintiffs in establishing imminent and substantial endangerment to health or the environment.

11

At most their evidence shows that there is substantial contamination on the property and that the level of the contamination warrants some kind of screening risk assessment by the regulatory agencies.  However, Plaintiffs fail to point to any testimony that someone or something may be exposed to a risk of harm by the contamination if remedial action is not taken.  Dr. Kablanow's brief statement that any presence of gasoline is not normal to the environment does nothing to establish that endangerment is caused by the particular contamination found on Plaintiffs' property.  Furthermore, Exhibit 187 fails to specify if the groundwater on the property ties into the Livermore-Amador Groundwater Basin's groundwater supply or the probability that groundwater from the property would be used.

   Plaintiffs interpret this letter to establish that the groundwater on the property will definitely be used for drinking water and this means that, without remediation, someone or something will be harmed.  However, the letter merely speculates that at some unknown time in the future there is a possibility that groundwater from the property might be tied into groundwater in the Basin that may be used as drinking water.  To establish the level of groundwater on the property and whether any of the water under the property is or will be used for drinking water would require expert testimony, which Plaintiffs failed to produce at trial.

   This case is similar to several cases where the plaintiffs proved that there was substantial contamination on their property, but failed to prove that the contamination was likely to cause harm to someone or something.  For instance, in Two-Rivers Terminal, the

12

plaintiff's consultant opined that, because there was a water supply on the plaintiff's contaminated property and the state department of environmental protection had deemed the supply usable, a person could be harmed by drinking it. 96 F. Supp. 2d at 445. The court held that, even though the state regulatory agency might consider the water drinkable, on a RCRA claim, federal law, not state law, is relevant, and the fact that no one was drinking the water eliminated it as a threat to health or the environment. Id. at 446. The court concluded that the plaintiff had merely shown that substantial contamination existed on its property and this was insufficient to establish liability under RCRA. Id. at 446-47. In Cordiano v. Metacon Gun Club, Inc., the court reviewed the plaintiff's evidence, an expert report that stated, "[T]he presence of firing-range-related contaminants on the site, primarily total lead, represents a potential exposure to risk to both humans and wildlife. A risk assessment utilizing the data obtained during this investigation would be necessary to evaluate the degree of risk to humans and wildlife." 575 F.3d 199, 211 (2nd Cir. 2009). The court held that this evidence was "insufficient to permit a factfinder to assess the magnitude of the possible risk identified in the . . . report. . . . There is thus insufficient evidence for a jury to find that the alleged contamination presents a reasonable prospect of future harm, and hence that it may present an imminent and substantial endangerment to the health or the environment." Id. Additionally, to establish that the lead contamination on the site presented a potentially serious risk, the plaintiff relied solely on the evidence that the contamination

13

exceeded the state's thresholds for lead contamination on similar residential sites. Id. at 212. The court explained that state environmental standards do not define a party's federal liability under RCRA. Id. Further, the plaintiff had provided no evidence that anyone was subject to long-term exposure to lead contamination at the site, or that realistic pathways of exposure were there. Id. at 213. Thus, the court held that the plaintiff had failed to prove that the potential harm at issue rose to the level of serious endangerment. Id. at 214.

In Newark Group, Inc. v. Dopaco, Inc., 2010 WL 1342268, *5, 6 (E.D. Cal.), the court held that the plaintiff's evidence that the contamination in the soil and groundwater on its property far exceeded the environmental cleanup standards set by state and federal regulatory agencies, together with the state agency's statement that it considered all groundwater in the Central Valley Region to be a potential source of municipal or domestic water supply, was insufficient to show that the risk of endangerment from the contamination was imminent. The court explained that the plaintiff had merely shown that the endangerment was possible, but was required to show that the endangerment was imminent by showing that it threatened to occur immediately. Id. at 7. The court held that evidence that certain samples from the property exceeded government standards did not provide an adequate basis for a jury to conclude that federal law under RCRA has been violated. Id.

Similarly, Plaintiffs here have merely shown that the contamination on the property exceeds state regulatory standards and that the groundwater on the property potentially may be, at

14

some unknown time in the future, a source of drinking water. The Court finds and concludes that this is insufficient to show, by a preponderance of the evidence, either the imminence of harm to health or the environment or the substantial nature of the future harm. Judgment shall enter for Defendant on the RCRA claim.

III. Equitable Contribution

California Civil Code § 1432 provides, in relevant part:

> a party to a joint, or joint and several obligation, who satisfies more than his share of the claim against all, may require a proportionate contribution from all the parties joined with him.

Equitable contribution is the right to recover, not from the party primarily liable for a loss, but from a co-obligor who shares such liability with the party seeking contribution. Morgan Creek Residential v. Kemp, 153 Cal. App. 4th 675, 684 (2007). The right of contribution, although related to some former transaction or obligation, exists as a separate contract implied by law. Id. Where two or more parties are jointly liable on an obligation and one of them makes payment of more than its share, the one paying has a claim against the others for their proportion of what it has paid for them. Id. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by co-obligors and preventing one obligor from profiting at the expense of others. Id. The right of contribution arises as soon as a party pays more than its share of the obligation, but not until then. Jackson v. Lacy, 37 Cal. App. 2d 551, 559 (1940).

A. Joint Obligation

Plaintiffs argue that the cleanup orders from the state

15

regulatory agencies create a joint obligation, pointing out that these orders, all of which are addressed to both parties, state:

> If it appears as though significant delays are occurring or reports are not submitted as requested, we will consider referring your case to the Regional Board or other appropriate agency, including the County District Attorney, for possible enforcement actions. California Health and Safety Code, Section 25299.76 authorizes enforcement including administrative action or monetary penalties of up to $10,000 per day for each day of violation.

Plaintiffs also cite Health and Safety Code § 25299.70, which provides that an owner or operator who has not complied with any corrective action order shall be liable for the full costs incurred in cleaning up the site, and § 25299.73, which provides that the standard for the obligation to pay any costs of corrective action is strict liability. Plaintiffs argue that, because the cleanup orders are enforceable under the California Health and Safety Code, they create a joint obligation in that "they are addressed to both the Sullins and ExxonMobil as parties who are jointly responsible for the remediation of the Property."

Under California Civil Code § 1427, an obligation is defined as "a legal duty, by which a person is bound to do or not to do a certain thing." Under California Civil Code § 1428, an obligation arises either from a contract between the parties or the operation of law, which may be enforced in the manner provided by law, or by civil action or proceeding.

California Health and Safety Code §§ 25280 et seq. govern the operation of USTs in California. Section 25296.10 provides the corrective action requirements in response to unauthorized releases from USTs. Section 25296.10(c)(1) provides that, when a local

16

agency requires a responsible party to undertake corrective action pursuant to an oral or written order, that party shall prepare a work plan that details the corrective action that party shall take to comply. Section 25296.10(f)(1) provides that, if the responsible party does not comply with the order, the local regulatory agency may undertake the corrective action. Section 25299(d)(1) and (2) provides that any person who violates any corrective action requirement established pursuant to § 25296.10 is liable for a civil penalty of up to $10,000 for each UST for each day of violation and the penalty may be imposed in a civil action or administratively by the regulatory agency.

The Court concludes that these statutes governing the operation of USTs establish that the cleanup orders are orders that carry the force of law and create the joint obligation necessary for an equitable contribution claim. The fact that the statutes use the word "shall" when indicating how a responsible party is to respond to a cleanup order shows that the party does not have a choice; it must comply with the order. Further, if a party fails to comply with a cleanup order, the state agency has the authority to impose a civil penalty administratively or to file a civil action to impose the penalty. This meets the definition of obligation under Civil Code § 1427: a legal duty that the party is bound to do or not do a certain thing and that may be enforced in a manner prescribed by law or in a civil proceeding.

This issue is decided in Plaintiffs' favor.

B. Proportionate Share of Cleanup Costs

To establish a right to equitable contribution, Plaintiffs

17

also must show that they have paid more than their fair share of the obligation, that is, the cleanup costs. The evidence shows that Plaintiffs have paid all of the cleanup costs and Defendant has paid nothing. However, eighty-five percent of the costs Plaintiffs incurred have been reimbursed by the UST Fund. The parties stipulated that Plaintiffs have spent $42,237.95 which has not been reimbursed by the UST Fund.

Plaintiffs argue that Defendant should pay the entire $42,237.95, and all future costs, as its equitable contribution because the jury concluded that Defendant contaminated the property, and Defendant has done nothing to comply with any cleanup orders. Defendant responds that, even if it was responsible for some of the contamination, it could only be responsible for leakage from USTs, and there is no evidence that this amounts to more than eighty-five percent of the expense, which has been reimbursed by the UST Fund. Defendant also argues that no evidence has been submitted to prove that Plaintiffs are responsible for less than fifteen percent of the contamination, which would be another way to prove that Plaintiffs have paid more than their fair share of the cleanup costs. Plaintiffs reply that they are not responsible for the Pitcock Release and, thus, are not responsible for any contamination on the property. Plaintiffs lament that, although they are not responsible for any contamination, they have paid 100 percent of the cleanup costs over the past twenty years. They argue that "the only possible conclusion the Court can reach is that Sullins have paid more than their fair share. Any amount above $0.00 is more than Sullins' fair share." Thus, they conclude

18

that Defendant should pay all of the $42,237 and any additional future costs that may be unreimbursed by the UST Fund.

Although Plaintiffs may not have caused the Pitcock Release, neither did Defendant. It occurred while Plaintiffs owned and operated the business on the property that required the gasoline that Pitcock delivered to the property. Furthermore, Plaintiffs settled their claims against Pitcock and were reimbursed for the damages caused by the Pitcock Release. Thus, Plaintiffs, and not Defendant, are responsible for the contamination caused by the Pitcock Release.

Because the UST Fund reimbursed Plaintiffs for cleaning up the contamination caused by the USTs, which the parties agree is eighty-five percent of the amount Plaintiffs have spent, to prevail on this issue, Plaintiffs must show that the contamination from the USTs was more than eighty-five percent of the total contamination on the property. Plaintiffs have failed to do so. Plaintiffs concede that no evidence of percentage contributions was presented at trial. RT at 710-3-12.

Because Plaintiffs have failed to establish by a preponderance of the evidence that the contamination on the property was more than eighty-five percent attributable to the USTs, their claim for equitable contribution fails. Judgment on this claim shall enter in favor of Defendant.

## CONCLUSION

For the foregoing reasons, Defendant's Rule 50 motion and motion for a hearing are denied. The Court finds and concludes that Plaintiffs failed to show by a preponderance of the evidence

19

that the contamination on the property poses a substantial and imminent endangerment to health or the environment. The Court further finds and concludes that Plaintiffs have failed to show by a preponderance of the evidence that they have paid more than their fair share of the joint obligation to clean up the contamination on the property.

    Judgment shall enter in favor of Defendant on the RCRA and equitable contribution claims. All parties shall bear their own costs of suit.

    IT IS SO ORDERED.

Dated: 1/26/2011

CLAUDIA WILKEN
United States District Judge

20